## THOMSON ELECTRIC WELDING CO. et al. v. BARNEY & BERRY, Inc.

(Circuit Court of Appeals, First Circuit.   October 5, 1915.)

### No. 1115.

PATENTS 328—VALIDITY—ELECTRIC WELDING:
The Harmatta patent, No. 1,046,066, for process of electric welding, was not anticipated, discloses invention, and is not invalid because of amendments of the application while pending in the Patent Office.

Appeal from the District Court of the United States for the District of Massachusetts; Frederic Dodge, Judge.

Suit in equity by the Thomson Electric Welding Company and another against Barney & Berry, Incorporated, for infringement of letters patent No. 1,046,066, for a method of electric welding, issued to J. Harmatta December 3, 1912. Decree for defendant, and complainants appeal. Reversed.

The following is the opinion of the District Court:

The Thomson Electric Welding Company owns United States patent No. 1,040,066, for improvements in electric welding, issued to Johann Harmatta December 3, 1912, upon his application filed December 3, 1903. It acquired Harmatta's rights in February, 1912, while his application was still pending. The other plaintiff, Universal Electric Welding Company, is, and has been since 1909, exclusive licensee under all patents then or thereafter owned or controlled by the Thomson Company, including the patent whereon the present suit is brought.

There are 21 claims in all; the first 16 being for a method or process described, and the last 5 for the product thereof. Infringement of all the claims is charged, but the plaintiffs ask the court to consider only 8 of the process claims (Nos. 3 to 6, 8, 9, 11, and 12) and only 4 of the product claims (Nos. 17, 18, 19, and 21). The defenses are lack of invention, anticipation, invalidity because of changes made in the application before issue, and noninfringement.

Introductory statements in Harmatta's specification are that his invention relates to the manufacture of metal articles of all kinds, and consists in a

---

328For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

novel method of fastening their component parts together by the process of electric welding; also in the new article produced thereby. The invention is further said to afford a cheap and practical substitute for riveting.

Consideration of former methods of uniting metals by electric welding is therefore required, in order to determine the precise scope of Harmatta's invention. For the purposes of such inquiry, his own definition of "electric welding" may be adopted. He says in his specification:

"By the term 'electric welding,' as used herein, I mean that well-known process in which the work is brought to the welding temperature by internal heat generated by the resistance of the work itself to the passage of an electric current at the place of contact between the parts to be joined by the welding pressure."

And this is immediately followed by his express disclaimer of "those processes of fastening pieces of metal together in which the parts are heated and practically melted down by an electric arc generated on the back of the piece by 'drawing' an arc by means of the electrode, as well as other processes in which the welding heat is generated externally and electrically in a resistance material and is imparted to the work by heat conduction from said resistance material in contact with the work."

The electric welding art may be said to have begun with the inventions of Elihu Thomson, disclosed in two United States patents issued to him on August 10, 1886—Nos. 347,140 and 347,141. The first of these describes the process of "butt-welding," wherein the ends of wires or bars, held by suitable electrodes, are butted together under pressure, raised to welding heat by an electric current of small voltage and large volume passed through them from one electrode to the other, and caused to unite into one mass over their entire area of contact, while thus plastic, by the pressure applied. A slight burr or flange of metal, extruded while plastic at the junction point, is left in the welded article. The second of the above patents covered the apparatus for carrying out the process described in the first.

Five years later (January 20, 1891) another United States patent, No. 444,928, was issued to Thomson, covering a process of joining two strips, sheets, plates or bars of metal by continuous electrically welded seams. Roller electrodes were used, between which the two strips or sheets to be joined were fed during the passage of current from one to the other. Suitable pressure devices enabled the opposed electrodes to hold the two strips or sheets in close contact between them at the point of the current's passage. The use of roller electrodes permitted an uninterrupted current to be passed through all points within the line of the desired seam successively and without relaxation of the pressure. Electrodes not provided with means to permit this could not have produced a continuous seam, but only, at most, a series of more or less frequent welds along its line, each requiring separate application and interruption of pressure and current.

A still later United States patent to Thomson, No. 496,019, issued April 25, 1893, covered a process of soldering (instead of welding) two overlapped sheets of metal together by the passage of current through them, so as to produce the necessary heat where the desired junction was to be made, between two electrodes arranged to hold them there in contact while the current passed. Less heat, and therefore less current, is required for soldering than for welding. The process described in this patent might have been used to produce a welded, instead of a soldered, union between the sheets merely by an increase in the amount of current passed between the electrodes.

All the above patents have belonged to the Thomson Company since their issue. The two "butt-welding" patents expired August 10, 1903, shortly before Harmatta's application was filed. There was reference to them and to others of the above patents in the patent in suit, made in connection with the patentee's statement of the scope of his invention.

The patent states that in general terms the invention may be said to consist "in fastening the pieces together by an electric weld at one or more distinct or well-defined spots, each of small area or extent in their juxtaposed or opposite plane faces, by the application of pressure and heating current localized in such spots, and in the special method of localizing the heating and pressure in the spot or spots as hereinafter described," etc.

The substance of the description then following is contained in the following passage quoted from the plaintiffs' brief:

"Harmatta's invention may be thus described:—

"Two comparatively thin sheets of metal can be joined together by one or more isolated welds in their meeting surfaces, made by applying electrodes of limited facial area to the backs of the sheets, pressing the electrodes and sheets together, and passing a welding current from one electrode to the other, whereby a weld is made between the sheets at the spot, the area of which is determined by the area of the electrodes in contact with the metal sheets."

The patentee's references to former patents are:

"It has been before proposed to electrically weld two rods of metal together by a butt-welding process, the area of union effected being substantially co-extensive with the cross-section of the pieces at their meeting ends; that is to say, the weld has been made over substantially the whole area of the opposed portions of said pieces. It has also been proposed to make a lap joint between the ends of two strips of metal by electrically uniting them together over substantially the whole area of the lapping surfaces."

"I am also aware of patent to H. F. A. Kleinschmidt, No. 616,436, dated December 20, 1898, and do not wish to be understood as claiming anything disclosed in said patent."

The patent here referred to does not appear to have belonged, like the others, to the Thomson Company but to the Lorain Steel Company, whereof Kleinschmidt was an employé. In using his patented method commercially, however, he testified that he used an electric welding machine made by the Thomson Company. His patent covers a process of attaching splice bars to rails. Two splice bars, each having on one side three projections or "bosses," one at each end and one in the middle, are placed, one bar against each side of the abutted rails, so that their projections are opposite each other and their middle projections opposite the junction of the rails. Their contact with the rails is through their projections only. Electrodes of much greater facial area than the projections are applied against the backs of the splice bars opposite each pair of projections. Pressure applied to the electrodes in the direction necessary to force them toward each other holds the webs of the rails and the splice bar projections in contact with the electrodes and each other; the required current transmitted between the electrodes heat the projections, and so much of the webs of the rails as lies between them at the contact points, to welding heat, and the pressure applied as above causes union at those points.

To the remaining patents in evidence as part of the prior art briefer reference will be sufficient. Of United States patent 363,320, to Benardos and another, May 17, 1889, and the German patent to Benardos, 50,509, February 19, 1890, it is enough to say that neither relates to electric welding in the sense of the patent in suit, and that both processes described are of the kinds expressly disclaimed by Harmatta, as above.

United States patent No. 670,808, to Perry, March 26, 1901, covers a method and machine for electrically welding the rods or wires of metallic fencing at their crossing points, by a simultaneous application of mechanical pressure and electrical current at those points. The similarity of what is described to the process of the patent in suit is at most general, and not more significant, for the purposes of the questions presented, than in the case of the Thomson and Kleinschmidt patents already mentioned.

United States patent to Hunter No. 690,958, January 14, 1902, is for a method of electrical welding together similar sheets of metal at their ends, so as to produce water-tight joints between them, and form from them continuous lengths for roofing purposes. Pressure and current are simultaneously applied to melt and unite the metal of the sheets at a series of points determined by projections previously formed in one and arranged to contact with the other sheet along the desired line of junction. The metal, melted where each projection contacts with the other sheet, spreads to unite with that at the next projection and thus to form a full transverse weld. No such spreading of molten metal is contemplated by the process of the patent. Except that metallic sheets are to be joined instead of rails, I find no resemblance

in this process to that of the patent more significant than in the case of the Kleinschmidt patent.

The plaintiffs say that Harmatta's method of joining comparatively thin sheets of metal by isolated welds, made in the manner described, "was a radically new idea."

But so far as he did no more than employ simultaneously the passage of electric current to bring the work to welding temperature at the place of contact by its own resistance, and application of welding pressure at the same place, he introduced no new idea at all. All this, if not necessarily involved in the terms of his own definition of "electric welding," is certainly to be found in each one of the inventions disclosed in the various patents before mentioned which make use of that process. His new idea, if any, must be something beyond this.

The plaintiffs contend that localizing the current by pressure in a particular limited area of the contacting surfaces of the work, determined by the area of the applied electrode, and thereby bringing that limited area to a welding temperature without material heating of the adjacent parts, was new with Harmatta. It is said that, by localizing the pressure at the selected limited area of the work he thereby reduced the resistance, concentrated the current, and increased its welding power within that area, securing at the same time, by means of the pressure upon the softened metal within the same area, the desired molecular union there between the two sheets. But all this is necessarily accomplished at every point successively along the line of the continuous electrically welded seam made by the process of Thomson's patent No. 444,928. It must also be accomplished, so far as I can see, in every case of an electric weld covering less than the whole area of the surfaces joined, made under pressure exerted between the two electrodes. The passage of current and the heating of the metal must occur at those places within which the resistance is most diminished by the pressure. Claims drawn upon the theory that such localization of pressure, current and heating were new with Harmatta appear to have been repeatedly rejected and canceled in the Patent Office before his patent issued.

The prior art thus leaves no room, so far as I can see, for crediting Harmatta with any idea beyond that of making his electric welds small in area, rather than large, in comparison with the areas of the opposed surfaces to be joined, and isolating them so as to leave each surrounded by a comparatively large area of unwelded surface. Although his patent states that a weld formed by his process is distinguished from prior welds, "among other things," in the above respects, these are the only respects which he specifically mentions and they are in my opinion the only respects in which any distinction can be said to exist.

It is difficult to regard the above as an inventive idea. Referring again to the Thomson patent, No. 444,928, the process therein described, while it is said to be "especially applicable to the welding of plates together at their edges, instead of riveting," is just as applicable to the welding of plates or sheets at other places within their area as at their edges. The roller electrodes employed, when brought together on each side of the work, and until something more is done, will pass the electric current and make the weld at the spot or point of pressure and nowhere else. (See claim 1 of the patent referred to.) If, having there made the weld, they should be again separated, instead of having the work fed between them while their pressure upon it continued, they would leave an isolated spot weld joining the plates and be in readiness to make another weld isolated from the first by any desired area of unwelded surface.

The plaintiffs say that, although machines were built to carry out the roller process of the last-mentioned patent, they were not practically successful, and that the process has proved a failure so far as commercial success is concerned. Their evidence tends to support this contention, and to show that there are practical difficulties attending the use of the process. But so far as the question raised is important, I think the plaintiffs' evidence tending to show want of success is fully met by that of the defendant, according to which the process has been successfully carried out by machines built and commercially installed by at least two different concerns. Samples of the

work they have produced by using it are among the exhibits in the case, and there is nothing to show that such work is unsatisfactory in character.

The presumption of validity arising from the issue of the patent seems to me entitled in the present case to less than the usual weight, in view of the history of the Patent Office proceedings upon Harmatta's application as disclosed by the file wrapper and contents in evidence. As has appeared, the application was pending for ten years before the patent issued. As originally filed, the application described a process of roller welding substantially like that of Thomson, with the statement toward the close of the specification that, instead of introducing the piece to be welded gradually between the electrodes, the welding apparatus might be arranged to slide relatively to them, and that, if required to weld sheets only at particular places, apparatus employing electrodes having the form of pins might be used, instead of the roller electrodes, to produce "a small, round, very sharply defined place of welding," answering the purposes of a rivet. There were two claims covering roller welding and two others not thus limited. The idea of roller welding thus appears to have been, with Harmatta, the foundation and origin of his further idea of spot welding, and his further idea to have consisted in nothing more than stopping with the first point welded, instead of continuing it into a welded line.

Harmatta's roller welding claims having been rejected in view of Thomson's patent and canceled on May 14, 1904, with so much of his original specification and drawings as related to them, his application became and thereafter continued to be an application covering "spot welding" only. The original claims covering it, however, soon disappeared, and there were further successive rejections, cancellations, amendments, and substitutions of new claims in 1904, 1905, 1906, 1907, and 1910. Meanwhile patent No. 928,701 issued on July 20, 1909, to Rietzel, on an application owned by the Thomson Company. March 31, 1910, Harmatta copied some of the Rietzel claims, at the suggestion of the Patent Office, in order that an interference might be declared. After this had been done, on April 26, 1910, Harmatta added still other Rietzel claims to his application, and it was acquired also by the Thomson Company, pending the interference, in February, 1912. The interference was decided in his favor in October, 1912; but, before issue of the patent, still another cancellation and substitution of a new specification with new claims was found necessary, wherein the invention was for the first time stated to consist in having the welds small and surrounded by comparatively large areas of unwelded surface.

All this may be regarded as significant on the question of patentable novelty (Richmond v. Atwood, 48 Fed. 910, 913, 1 C. C. A. 144) and it seems sufficient to indicate, at least, that only with unusual difficulty was Harmatta able to suggest, or the Patent Office to find, in his spot-welding process, however described, anything capable of being regarded as patentably new in view of the prior art.

Under its butt-welding patents and roller-welding patent the Thomson Company appears to have had a complete monopoly of electric welding. The latter patent expired January 20, 1908. While the monopoly continued, electric welding machines could be had only under lease from the Thomson Company, restricting their use to specified articles. In 1908 the Toledo Electric Welder Company, which made the machine which the defendant uses, and is defending this suit, began to make and introduce machines for spot welding. Other concerns followed in 1908, 1910, and 1911, all acting without knowledge of previous applications by Harmatta or others for patents covering the spot-welding process. Under these circumstances it can hardly be said that, upon the question of patentable novelty in anything invented by him, Harmatta is supported by any advantages which the development of spot welding since 1908 has shown to reside in the process, or by any commercial success it has attained. I do not think the facts shown entitle him to say that by his alleged invention as he was finally obliged to define and limit it, he was the first to supply a wide spread demand not previously met.

The defendant's use of the Toledo machine, which is here complained of as an infringement, is in the manufacture of skates. The greater part of the work done by the machine is in uniting two strips of metal, each forming half of a skate runner, by successively made, contiguous, overlapping, spot-electric welds, small in size, which together make a practically contin-

uous weld from one end of the runner to the other. The process is carried on with such rapidity that one weld has hardly begun to cool before the weld adjoining it is made. The completed row of welds is thus, for all practical purposes, like a continuous seam weld produced by the use of roller electrodes. The welds of which it is composed are neither isolated nor separated by comparatively large areas of unwelded surface. I do not see how, in any case, the patent could be so construed as to make this method of welding an infringement. If not, to sustain the patent involves leaving the question of infringement to depend merely upon the amount of unwelded area left between the welds, and this result seems to me to afford a further reason against holding it valid.

My conclusion must be that the process described in the patent does not involve invention, in view of the prior art. There may be a decree dismissing the bill with costs.

Frederick P. Fish, of Boston, Mass. (J. Lewis Stackpole, of Boston, Mass., on the brief), for appellants.

Lawrence K. Sager and Clifton V. Edwards, both of New York City, for appellee.

Before PUTNAM and BINGHAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This case alleges infringement of a patent for an invention, and the decree in the District Court was for the respondent. Thereupon the complainants appealed to us. The opinion of the learned judge of the District Court refers to the fact that there were 21 claims in all; the first 16 being for a method or process, and the last 5 for the product. The opinion also states that the complainant asked the court to consider only 8 of the process claims, Nos. 3 to 6, 8, 9, 11, and 12, and only 4 of the product claims, Nos. 17, 18, 19, and 21.

The alleged defenses are lack of invention, anticipation, invalidity because of the changes made in the application before issue of the patent, and noninfringement. We need not distinguish the defenses by taking them each up, separately and specifically, because the whole case turns mainly about a single major proposition.

The opinion of the learned judge of the District Court says that the introductory statements in the patentees' specification are that the inventions relate to the manufacture of metal articles of all kinds, and consist of a novel method of fastening their component parts together by process of electric welding, and also of the new articles produced thereby. He also observes that the inventions are further said to afford a cheap and practical substitute for riveting.

The brief for the complainants, now the appellants, states substantially the complainants' case, as follows:

"Harmatta's invention of the patent in suit was a new departure in the art of electric welding, which art had been created by the inventions of Prof. Elihu Thomson, in 1886, shown and described in the Thomson patents, Nos. 347,140 and 347,141.

"These Thomson patents show and describe for the first time the process of electric welding, but disclose only how it may be applied to joining the butt ends of two metallic rods together by passing an electric current of low voltage and high amperage from one rod to the other. The invention was a valuable one and went into commercial use, where the process became known as 'butt-welding.' In this Thomson butt-welding process two metal rods are held by large copper electrode clamps, which are respectively

the terminals of the electric circuit. When the current is turned on, it flows in its circuit through the electrode clamps and through the ends of the rods which protrude beyond the electrodes. As the rods are of smaller cross-section than the electrodes, they restrict the flow of the current to the smaller path which they afford, and they thereby concentrate the current and increase its heating effect.

"The resistance of the rods, together with the resistance at the joint between their abutting ends, increases the heating effect of the current so that the ends of the rods are highly heated by the current and become plastic. The resistance and resulting heat at the joint are comparatively great, because of the break in the continuity of the metallic circuits, and the consequent obstruction to the flow of the current.

"When the ends have thus become plastic, the rods are pressed bodily toward one another, the metal spreads and unites, with the result that the ends of the rods are joined by a weld. At the point where the joint is, the extruded metal forms an annular ridge.

"The characteristics of this butt-welding process are that—

"(1) The current is concentrated by the rods themselves, the ends of which are being welded together.

"(2) The welding heat is caused by the resistance of the metal between the clamps and by the resistance of the joint at the ends of the rods.

"(3) The area of the weld is determined by the area of the work—i. e., the ends of the rods.

"(4) The metal is extruded around the joint.

"(5) As the rods are united, they approach one another bodily, so that allowance for this always must be made.

"The plaintiff was formed to develop this Thomson invention. It has been engaged in the business of making and leasing machines for performing this process of butt-welding. It has also granted licenses, as, for example, to the other complainant, the Universal Company, which had a license for spot-welding, in 1909, which refers to prior licenses for 'spot-welding,' granted in 1904.

"These Thomson patents protected this business, for they covered broadly the process and product of electric welding, as Thomson's invention was a true pioneer invention, having created the art of electric welding.

"But the underlying Thomson patents disclose as his only specific application of his fundamental invention one which was of limited utility, namely, the electric welding of the butt ends of two rods. But until Harmatta's invention, by which for the first time in the art it was practical and feasible by the use of new principles of operation to unite two thin plane sheets of metal together by electric welding, at any spot or at several spots of their contacting surfaces, no practical application of Thomson's invention of electric welding was made beyond that of the butt-welding originally disclosed by him in his patents of 1886, in spite of the efforts of himself and other inventors."

In order to make clear the state of the art, it was necessary to explain, as we have just done, the primary inventions covered by the patents of Elihu Thomson of 1886. These constitute the foundation of the whole art of electric welding, and the patent now in suit, as other secondary patents to which we may now refer, must be regarded as developments or branches of Thomson's original invention, and as merely subsidiary inventions or improvements. There have been other subsidiary inventions, as, for instance, the lap-roller process, invented also by Thomson, by which the method of uniting the overlapping edges of two sheets of metal by a lap-weld was devised, and by virtue of which some other secondary inventions were made practicable; all of which may be regarded as growing out of the inventions of 1886, but all of which were in different fields from the spot-welding invention now un-

der consideration, and were in no way subsidiary to it or incidental thereto, so that neither the one nor any of the others anticipated Harmatta's invention or were infringed by it or infringed it. Although all growing out of the same root, they were independent branches. Consequently, we have only to consider further the following alleged defenses to the complainants' bill, namely:

That there is no patentable invention in welding separated spots.

That appellants' attempted distinctions are without basis.

That there was no distinction between roller electrodes covering the entire amount of the overlap, and Harmatta's process.

That Thomson's sheet patent, No. 496, 019, showed sheet metal united by soldering, and thus anticipated.

That it also showed electrodes having area less than the contacting area, as in Harmatta.

That the Thomson process is the same as Harmatta's, the difference being in the amount of pressure and current only, and that generally there was no showing of invention by Harmatta's patent.

That the appellee's does not infringe,

And that Harmatta's patent is invalid by reason of changes since the original application.

Returning to the defenses based on the roller electrode process, or other processes devised with reference to overlapping sheets, it is all too plain that neither in its practical operation nor in its result was there any resemblance to the spot-welding such as to require discussion. It is quite plain that the attempts in that direction were too experimental to form the basis of any sound defense; indeed, that defense, and the proposition of accomplishing the work by soldering were each in an art so remote as to require no attention beyond these brief references thereto. These observations apply to all those lines of defense which rest upon the attempt to compare the size of contact spaces or areas mathematically, because the spot-welding has nothing in common with such attempts; and, furthermore, a study of all these special defenses going to the proposition that spot-welding, as shown by Harmatta, was in any way anticipated, falls to pieces, because there was nothing in them indicating an element of commercial success, and in this art, which was special and practicable, the art for rapid and inexpensive or cheap product was the first element of success. It is enough to repeat what we have already said generally; that is, in all these defenses of anticipation there is nothing which includes practicable utility.

Apparently much reliance is placed upon the claim that the application for the patent, during the many years it was pending, had been essentially changed, and so lost its validity. It originally embraced, not only spot-welding, but line-welding, and line-welding was not abandoned until after the alleged infringers in this case had constructed the machine with which they were operating when the bill was filed. The patent was applied for on December 3, 1903, and was not issued until December 3, 1912; but the claim for spot-welding was always in the application. The alleged infringing machines were first constructed in 1908; in 1910 the application covered both spot-welding and line-welding. It was then amended by striking out all claims for line-welding;

so, therefore, perhaps no profits can be recovered for anything done prior to the amendment, and it is a question to be considered whether or not an injunction can go against machines constructed before the amendment was made, or, if at all, then to what extent.

We have not been called upon to give consideration to any questions of this character, and the bill and briefs in support of the bill do not suggest any qualified decree in the matter whatever. The bill must, of course, be sustained, in view of the propositions we have already announced; and in view of the further proposition that the presumptions in favor of the patent are so far supported in this case by the insistency of the defense, and the comparatively enormous expense involved in maintaining it, we cannot question the present validity of the patent with reference to all propositions involved in the word "patentability." Nevertheless, the case is not put in such form as to enable us to go to a final judgment without further investigation. Indeed, it is not positively established what the proceedings of the respondents have been since the patent issued. The nearest that comes to it is the admissions of the treasurer of the Barney & Berry Skate Works, the nominal respondents in this case, that the respondents had been using an infringing machine "before February, 1913," and "just before that time." There was also testimony of a witness for the complainant that he had seen the alleged infringing machines in operation on January 9, 1913, and that the ends of the electrodes on the machines were all about a quarter of an inch in diameter.

Under the circumstances, we can only enter a qualified judgment.

The decree of the District Court appealed from is reversed, and the case is remanded to that court for further proceedings not inconsistent with the opinion passed down on this 5th day of October, 1915, and the appellants recover their costs of appeal.