### THOMSON SPOT WELDER CO. v. FORD MOTOR CO.

(District Court, E. D. Michigan, S. D. October 5, 1920.)

No. 246.

1. **Patents ☞328—1,046,066, for electric welding, invalid.**
   The Harmatta patent, No. 1,046,066 for a process of electric spot welding and the resulting product, *held* void for anticipation in the prior art and lack of invention.

2. **Affidavits ☞18—Not best form of testimony.**
   Affidavit testimony is subject to the weakness that it is usually not the composition of the affiant and it generally suffers in substance because another mind intervenes with interpreting and diluting effect between the witness and the auditor of his testimony.

3. **Patents ☞62—Prior use of machine established by sufficient evidence.**
   The testimony of the maker and user of a machine which practiced the process of a later patent, corroborated by that of a number of inde-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

pendent disinterested witnesses who could be disbelieved only on the ground that they committed willful perjury as to the dates when they saw the machine in use, and that its product was commercially sold, supplemented by the production of the machine itself, clearly identified, and a demonstration of its mode of operation, *held* sufficient to establish prior use, under the rule that such defense must be proved beyond reasonable doubt.

**4. Patents ⊕129—Equitable estoppel to claim validity.**

The owner of a patent, which in interference proceedings between such patent and a pending application, strenuously contended for priority of invention, filing the affidavit of the patentee, which supported such contention, and pending such proceedings brought suits for infringement of its patent, relying on the very claims in controversy, but which, on becoming owner of the pending application, abandoned its contention and secured the issuance of a patent thereon to itself, and thereafter filed a disclaimer of the disputed claims in the prior patent as having been inadvertently made, *held* equitably estopped to assert validity of the second patent, the effect of which would be to extend the term of its monopoly as against the public and such patent *held* void.

In Equity. Suit by the Thomson Spot Welder Company against the Ford Motor Company. Decree for defendant.

Frederick P. Fish and J. L. Stackpole, both of New York City (H. F. Lyman, of New York City, of counsel), for plaintiff.

Barthel, Flanders & Barthel, of Detroit, Mich. (Melville Church and A. S. Pattison, both of Washington, D. C., and O. F. Barthel, of Detroit, Mich., of counsel), for defendant.

KILLITS, District Judge. [1] This is an action for infringement of United States patent No. 1,046,066, allowed December 3, 1912, to the plaintiff's predecessor in title, as assignee, upon an application filed December 3, 1903, by Johann Harmatta. The patent is one for improvements in electric welding, and has 16 claims for process and 5 for product. The specific character of welding involved is that known as spot welding. The complaint alleges that all claims are infringed. Counsel for plaintiff treat and build their argument upon three claims as typical, namely:

"3. The herein described method of uniting two pieces of metal, consisting in pressing them together while passing a heating electric current from one to the other and localizing the flow of current and the heating throughout the operation in a spot or spots of circumscribed or limited area as compared with the area of the immediately opposed surfaces so as to limit the union of the pieces to a spot or spots."

"8. The method of electrically welding two plates or sheets of metal together face to face between electrodes, consisting in restricting the area of contact of an electrode with said plates to a spot, passing a heating electric current from said electrode to the co-operating electrode through said spot to heat the work to welding temperature and applying pressure to the work in line with said spot to effect a welding of one plate to the other."

"17. Metal plates fastened together by a number of distinct or isolated welds on their meeting surfaces and in spots comprising meeting portions of the metal plates, the backs of said plates being practically unaltered in their metallic condition and the spots on the meeting surfaces being separated from one another by distinct unwelded areas."

The defendant does not actively question title nor the truth of the more or less formal allegations of the complaint. The special defenses which we deem important are:

(a) Anticipation in the prior art, citing patents and publications which are hereafter discussed in some degree.

(b) Reduction to successful use prior to Harmatta's crucial dates by parties named, those particularly depended upon being F. B. McBerty, at Warren, Ohio, and Adolf Rietzel, at Lynn, Mass.

(c) The subject-matter, as finally set forth and claimed in the grant, was not set out in the application, and was not subsequently entered under cover of an oath of the inventor in the process of amendment.

(d) Lack of substantial variation from prior uses and publications, and hence lack of invention.

(e) Plaintiff, by the declarations and representations first made in its behalf, as assignee of United States patent 928,701 to Adolf Rietzel, issued July 20, 1909, upon an application filed February 24, 1905, and thereafter in interference proceedings between the Rietzel grant and the Harmatta application, is estopped to deny that Harmatta was effectively anticipated by Rietzel, and may not therefore assert the validity of the patent in suit.

The patent before us was adjudicated in 1915 at the suit of the Thomson Electric Welding Company (predecessor and privy in title to the plaintiff here) against Barney & Berry by a decision in the First Circuit Court of Appeals. Opinion by Judge Putnam, 227 Fed. 428, 142 C. C. A. 124.

There is substantial identity between the Thomson Electric Welding Company and plaintiff; wherefore, for brevity, we will hereafter refer to each as the Thomson Company in discussing transactions to which either was a party. Some of the questions in this case were determined in the adjudication referred to, but not all. Important references are not the same in the two actions, and the prior uses now alleged and specially depended upon here were not set up in the other case; besides, present defenses, as indicated above as (c), (d), and (e), are new. We have the record of the old case before us as part of this case.

The District Court in the former case (Circuit Judge Dodge sitting) found no patentability in Harmatta. It is regretted that the opinion of the Circuit Court of Appeals, reversing him, is so drafted that it is not helpful in elucidating the solution which it attempts. It is little more, in fact, than a formal reversal of Judge Dodge, who analyzed the prior art in finding anticipation. The Circuit Court of Appeals does not attempt to meet the reasoning of the District Court. Giving the opinion, however, all due respect, we still feel at liberty, in light of our larger and different record, to review the questions which the court in the First circuit has decided.

The application of Harmatta had many vicissitudes. It was filed December 3, 1903, and granted December 3, 1912. The specifications, as they finally appeared, are so different from those offered at the outset, that it is a matter of close analysis to trace their genealogy

to the latter. Eight times was the application rejected, after original and amendments were under scrutiny of three different examiners. The allowing examiner (the fourth one in charge) finally passed the case, as it then stood, to an allowance with evident reluctance, venturing the opinion that certain citations anticipated many of the claims. He (examiner Rich) concludes in his allowance as follows:

"Inasmuch as the claims of this case have previously been considered allowable, and those noted above have been contested in an interference with a patent wherein similar claims were granted, a formal rejection is not now made, since upon consideration and explanation it may appear that the references cited have been formally or informally considered in the examining division earlier having jurisdiction of the applications and held not pertinent. It is thought best, however, to note them, in order that, if the claims do differ from the patents, such differentiation may appear in the record."

February 9, 1909, the third examiner (Shaw), after the eighth rejection of the application, made this suggestion:

"It is thought that if there is any patentable matter in this case it resides in the securing of the sheet metal parts together by means of the small, round, sharply defined place of welding which answers the purpose of a rivet, as is set forth on page 6 of the original specification."

The original specification was canceled May 9, 1904, and the specification and claims had been repeatedly amended and twice entirely rewritten before 1909; each time excluding that in the original which Examiner Shaw qualifiedly approved. At no time prior to the latter's suggestion, not even in the original specification, was any claim made for patentability upon this specific idea; but, January 27, 1910, more than 11 months after the hint came from the examiner, two claims attempting to specifically cover it, were offered by way of amendment. They were rejected March 22, 1910, by Examiner Shaw. In the meantime the Rietzel patent (928,701) had been allowed. The examiner suggested that, in accordance with rule 96 of the Patent Office, applicant adopt Rietzel's claims for the purpose of interference, directing attention to the rule that, unless that were done, the application would be finally rejected as covering nothing new. Harmatta's counsel followed the suggestion, taking altogether 11 claims from Rietzel, and interference proceedings were begun with a declaration dated April 26, 1910.

Final allowance to the Thomson Company, as assignee of Harmatta, resulted after the close of the interference in 1912, but under circumstances which not only take away most of the force of the presumption of invention and patentability which otherwise would follow allowance, but give opportunity to reflections upon the good faith of plaintiff itself in its dealings with the Patent Office. We discuss this matter at length hereafter. We think the presumption in question gets all the honor due it in this case, if we do no more than to keep in mind that it exists.

Something analogous in suggestive flavor attends the situation which finally developed in and from the litigation in Boston which adjudicated for the First circuit. The record shows that counsel for defense in that case prepared their work ably in their briefs against the validity of

the patent. They are exhaustive and persuasive, but the presentation was lamentably lacking in the offering of known facts. Thus, while the McBerty alleged prior use, which figures so largely and importantly in this case, was known, it was neither pleaded nor vigorously offered. Likewise the Rietzel matter was ignored, although the losing counsel had also lately defended another client in a suit by the Thomson Company brought on the Rietzel patent.

Even if it be a fact that our views respecting the effect of the McBerty and Rietzel matters are in each instance unsound, it must be admitted that each is at least so significant in scope and application as to justify and very loudly suggest offering it to the court in a vigorous defense to a patent with which it is in seeming collision. After the adjudication in the case in Boston terminated, the successful litigant bought out its rival and gave the latter's responsible head, who, under his counsel, managed the defense, a most advantageous connection with the exploitation of the Harmatta process. This court does not permit itself to adjudge, to any extent, anything sinister in these matters; but, because of them, we not only find special occasion for regret that Judge Putnam did not write an opinion in reversing Judge Dodge's conclusions, which met the latter's reasoning in some detail at least, but there is an additional strong call for extreme care in this court, although the importance of the issue is itself so great as to demand our very best attention.

Passing upon the defenses, we may discuss together those designated above as (a) and (d), dealing with patentability in 1903 because of the then state of the art and prior uses. The file wrapper indicates a very unanimous opinion by the Patent Office examiners that Harmatta was treading a path barely, if at all, distinguishable from that marked out in the art, and their individual and independent judgments, as the case passed the years of its pendency by, seem confirmed by acquiescences in the repeated rejections. The record justifies Judge Dodge's observations (227 Fed. 428, 432, 142 C. C. A. 124, 128):

"That only with unusual difficulty was Harmatta able to suggest, or the Patent Office to find, in his spot-welding process, however described, anything capable of being regarded as patentably new in view of the prior art."

After careful consideration of the record, giving full respect to the unanalytical opinion of the Court of Appeals of the First Circuit in the Barney & Berry Case, the mind of this court concurs with that of Judge Dodge that the disclosures of the prior art were so illuminating that patentability did not rest in the Harmatta process, event as it was developed by the aid of Examiner Shaw after it had been in the office for more than 6 years. In our judgment, a question, the solution of which determines the issues here, abides in this record of greater scope than that of mere patentability of this process; but, that counsel may know the trend of this court's thought respecting them, we will consider as briefly as possible the matters of patentability and invention.

Counsel for plaintiff state the alleged novelty and advantage of the invention in these words:

"Harmatta for the first time in the art devised an electric welding process having the following characteristics and novel principles of operation:

"(1) The current is concentrated solely by the electrodes, and not by the articles being welded;

"(2) The metal, heated for welding, is entirely surrounded by comparatively cold metal;

"(3) The area of the weld is determined by the size of the ends of the electrodes, and not by the extent of the overlap of the articles being welded;

"(4) There is and can be no extruded metal; and

"(5) The parts are united in situ, as they are not caused to approach one another bodily during the process."

In our judgment, particular idea 1, as counsel designates it, is clearly exhibited in the Thomson patent, No. 444,928 (where Judge Dodge found it also), in Lemp, 553,923, as well as in Thomson's 496,019, which, although it called for electric soldering, is evidently important here for its disclosure effect, as the Patent Office itself recognized. All three of these patents, since their inception as applications, have been owned by plaintiff. The specification in Thomson's 444,928 states that—

"The frames $F$ $F'$, being of conducting material, may be connected with any suitable source of electric current of large volume through cables $C$ $C'$, or by other means, so that an electric current may be caused to pass from one roll to the other, and through any pieces of conducting material held between them in pressure contact."

It is obvious that this current is concentrated and applied from the faces of the rolls $R$ $R'$ held in the frames $F$ $F'$. We think that counsel for defendant in this case were fully justified in saying that the purpose of the invention of this patent is:

"To unite plane sheets of metal, face to face, by pressure and an electric welding current applied to the sheets to be united; the pressure being applied to the work through the electrodes that feed the current to the work, and the welds being formed between the contacting faces of the work at the point of pressure only."

Lemp so understood this Thomson invention, as evidenced by that language of his specification which speaks of the prior art, and he adopts the same device where he wishes to employ pressure at the time the current is applied; for he says that he uses rolls as terminals when he wishes to apply the welding or forming pressure in connection with the current. See lines 64 to 69, page 2, Lemp, 553,923, describing the operation of the device indicated by Fig. 3. In Thomson's electric soldering patent, No. 496,019, the "pressure pieces" $C$ $C'$ of Fig. 6 perform the same office. Burton says in his specification to his patent, No. 647,694:

"In the use of this apparatus the pieces to be lap welded are adjusted or placed with their ends overlapping on the bed electrode *100*. Then the foot lever is depressed, and one of the electrodes of the electrode head is brought into contact with the work, whereby the circuit is closed and the current passes through the work in transverse direction across the overlapping ends of the parts to be heated."

Of course lap welding is a form of flat welding. Any plates that can be lap welded may be generally flat welded by adaptation of the jaws holding the electrodes to permit the insertion, to a necessary degree, of the metal to be worked upon; that is to say, it is a mere matter

of slipping the two sheets to be united further along over their flat surfaces than is necessary for mere lap welding. Harmatta's device, for instance, is suitable either for lap welding, or for work more extended within the limits of the boundaries of the pieces worked upon, and the converse is true with mere lap-welding machines, if the jaws are sufficiently modified to meet the demands of the work. Harmatta's original specification was for lap welding. In his concluding paragraph therein is this suggestion by way of illustrating what he is working upon:

"If then two superposed sheet metal *ends* to be welded together are introduced," etc.

In Parkinson (English, 1894, No. 14,536), by Fig. 3, and in Bernados (German, 1890, No. 50,909) by Fig. 2, devices having the same function are shown. In the American translation in evidence, Bernados says:

"This process may serve to directly weld together relatively thin metal sheets and rods, of one and the same or of different metals. * * * This process is clearly distinguished, both from the point of view of the inventive idea on which it is based and from that of its mode of operation, from * * * the electric welding process of Elihu Thomson."

The idea is, we think, also very plainly in the Perry patent, No. 670,808. Other references are in evidence which defendant's counsel insist have a bearing here. Some of them will be discussed later in another connection. Enough, we think, is offered above to indicate lack of novelty in this first characteristic.

Going, now, to particular 2, that "the metal heated for welding is entirely surrounded by comparative cold metal" leaving a condition of "spot" welding, what do we find? Obviously, that the result is determined by the shape and character of the application of the current-concentrating electrodes. If these are roller forms and applied by rolling, as in Thomson, No. 444,928, and in Lemp and in Harmatta's discarded roller specification, the welded strips would be bounded on the sides only by comparatively cold metal. If roller electrodes are applied with either intermittent pressure or intermittent current, or if pin electrodes are used, of course there will be an entire surrounding of the weld by cold metal. Indeed, tthe idea that spot welding may be done with roller electrodes is present in both the Thomson (444,928) and the original Harmatta specifications. In the former, after directing that the plates, being between the rolls, should be squeezed together to form an electric contact, he says (page 1, line 88 et seq.) :

"The electric current, being now turned on, as it passes from one roller to the other and across the point of pressure, will heat the work to the welding temperature and soften the same slightly, after which the screw may be given a few more turns to effect a solid union. The work, *having been thus started*, may now be moved along through or between the rollers, so as to bring successive parts of the joint into position to be pressed and heated in the same operation."

Harmatta says (file wrapper, p. 3, second paragraph) :

"The pressure being exerted by roller electrodes, whereby the advancing series of *single points* * * * is united to a whole," etc.

In Thomson, 496,019, undoubtedly the result effected in plate *L*, at least of Figs. 4, 5, and 6, is to leave surrounding the welded portion an area of cold metal; also it seems clear that the flanges of the part (to be welded) designated as *P'* would be only incidentally and slightly heated in the process, merely because of their adjacence to the "pressure piece" *C'*. In Thomson's riveting patent, 396,015, the same thing is shown. There the so-called plunger and anvil, *G* and *E'*, really are the termini of electrodes, performing upon the material of the plates to be riveted, after the particular rivet is swaged and set, the same function, except in annular result rather than as a filled spot, which they obviously would accomplish if the applicable ends of each were flat, and not concave, and were used in plain spot welding.

Thomson says that, if the current is allowed to pass under pressure longer than is merely necessary to swage and set the rivet, "the application of pressure to the *pieces to be riveted will weld them together around the rivet*." Plainly this would be the work of whatever circumferential surface there is to the concave-faced electrodes, and just as manifestly these riveted places, surrounded by a ring of welding, would be further surrounded by areas of cold metal. When we contemplate the unequivocal form of this statement, and know that the result which it plainly suggests will follow, it is to be marveled at that Thomson, in endeavoring to assist the Thomson Company to obtain a patent on Rietzel's application, and in speaking of this patent of his (No. 396,-015), should say that (see file wrapper, Rietzel, No. 928,701):

"The only possible welding that could be produced by that process would be possibly some sticking of the edge of the perforation in the metal sheet to the side of the rivet which is a mere incident of the invention and *there is no welding of the superposed plane surfaces or opposed faces of the plates to one another* by welds disposed over such plane faces."

Notwithstanding this statement from such eminent authority, it seems to us that we are clearly given to know that there would result from the process of Thomson, 396,015, an annular welding together of the plane surfaces of the riveted plates beyond the rivet, the breadth of the welded surface within the circumference to be determined by the amount of annular plane surface on the faces of the electrodes which are concave at their centers. Besides, it seems that a deduction from the roller method is obvious that the question whether the weld shall be partially or wholly surrounded by cold metal depends either on the shape of the electrodes or on the size of the flat surfaces to be welded, or on the extent or manner in which the electrodes are applied to the face of the material to be worked on. For instance, if roller electrodes are first applied within the boundaries of the plates and stopped before any edge is reached, the result would be an elongated spot weld. So, also, would be the result if the plates operated upon in Thomson's, 444,928, had dimensions greater than the working face of his segment electrodes (Fig. 2). It is obvious, as noted above, that if roller or segment electrodes are simply applied to the plates with current and pressure, but not rolled, a spot weld would result.

The importance in Harmatta's field of the Kleinschmidt patent (No. 616,436), issued in 1898, was recognized by him in his final specifica-

tion, in which is disclaimed any feature disclosed by the Kleinschmidt grant. Whatever else may be said of the latter, it cannot be doubted that its welds are surrounded by areas of cold metal. Harmatta himself seems not to have considered, in his original application, the advantage of this particular (2) as an element of his invention. What he then thought he was inventing was, to use his language, a process which consisted:

"In one of the electrodes (or both of them), not only serving to feed the current, but also being employed for exercising a more or less strong pressure either before and during the period of supplying the electric current, or only at the moment of this supply, at the place at which the welding is to be done. The member which feeds the electricity is thus at the same time the tool, and in this manner the most favorable conditions of working possible are secured, since, as is well known, in really effective welding processes the place of welding, brought to the proper temperature, must be at once well hammered or pressed, in order that the welding may be thorough."

His only process claim in the original application was in this language:

"1. The process of electric welding, consisting in employing the electrodes not only to conduct the current to the objects being welded, but also to exert a regulable pressure on the same, substantially as described."

His remaining three claims were for apparatus. He treated spot or intermittent welding as if it were obviously, as it seems to us it is, but a variety of result, depending upon the choice of the operator. He illustrates two forms of apparatus for its accomplishment, and speaking of one of them says:

"Thus, if it is required to weld, for instance, sheets of metal only at particular places, the apparatus shown in Fig. 5 may be advantageously employed, the electrodes a b having the form of pins. * * * If then two superposed sheet metal ends to be welded together are introduced between the electrodes, and the latter then firmly pressed together and the circuit closed, a small, round, very sharply defined place of welding is caused, which perfectly answers the purposes of a rivet."

All this part of his specification he omitted in seven successive amendments and modifications, until, January 27, 1910, more than 6 years after his filing date, his counsel observes the hint of an examiner, made 11 months before, and then, for the first time, claimed this feature as the essence of his invention.

Should a patent have been allowed Harmatta on the original application, it cannot be said that he would have been protected against spot welding accomplished by any method not covered by his apparatus claims and without the limits of his process claims. Yale Lock Co. v. Greenleaf, 117 U. S. 554, 559, 6 Sup. Ct. 846, 29 L. Ed. 952.

It is plain that Harmatta applied in the first instance in ignorance of the state of the art. The original specification contains the clause quoted below, and upon the erroneous conception, therein indicated, that the field was wide open, he predicated his alleged invention:

"According to none of the present known electric welding processes are the articles to be welded firmly pressed together during the welding operation by one or both electrodes, for the purpose of favoring welding. Hitherto either no pressure has been exerted at all, or it has been exercised at a certain dis-

tance from the place of welding, or at all events not centrally, direct upon the electrodes pressing on the place to be heated. In short, hitherto direct electric welding pressure has never been exercised by means of the electrodes located in the direction of the current directly above the surface or point being welded."

It took nearly 7 years of experience in the Patent Office and the enlightenment of 8 rejections to finally convince him and his counsel that, at the best, a most restricted opportunity of invention was before him.

Judge Dodge finds that the only possibility of invention lay in making welds small in area, isolated in comparatively large areas of unwelded surface. Speaking of this he uses language which we would adopt:

"It is difficult to regard the above as an inventive idea. Referring again to the Thomson patent, No. 444,928, the process therein described, while it is said to be 'especially applicable to the welding of plates together at their edges, instead of riveting,' is just as applicable to the welding of plates or sheets at other places within their area as at their edges. The roller electrodes employed, when brought together on each side of the work, and until something more is done, will pass the electric current and make the weld at the spot or point of pressure and nowhere else. See claim 1 of the patent referred to. If, having there made the weld, they should be again separated, instead of having the work fed between them while their pressure upon it continued, they would leave an isolated spot weld joining the plates and be in readiness to make another weld isolated from the first by any desired area of unwelded surface."

We are unable to appreciate the distinguishing significance of particular 3:

"That the area of the weld is determined by the size of the ends of the electrodes, and not by the extent of the overlap of the articles being welded."

The very same conclusion, we think, is demanded from a consideration of the process and apparatuses disclosed in the patents already referred to. Thus, if in the overlapping offers room enough, the area of the resulting weld depends upon the form of the applied surface of the electrodes whether roller, pin or otherwise. It is only a matter of slipping the plates to be joined far enough over each other.

Nor are we able to agree with counsel's conclusion in particular 4, that there is and can be no extruded metal. Whether or not some metal, softened by the heat, through applying the method in question, will pass beyond the boundaries marked by the electrode faces, depends, not upon the method, but upon the skill and care of the operator in controlling the heat and pressure. That seems to be the clear effect of both testimony and example before us, and, without proof, it seems to be an entirely obvious deduction. In demonstrating for us the process in suit upon one of plaintiff's improved machines, plaintiff's expert, Gravell, burned a hole through the plates to be welded. He employed an excess of both current and pressure. Had he used less pressure, it is to this court unimaginable that some of the oversoftened metal of the plates would not have escaped beyond the peripheries of the points. Too much pressure, too much heat, either or both, it seems, must bring about extrusion. If the point to be welded is well within the limits of both plates, the related pressure outside of the

heated area may confine extrusion to microscopic lines. If the spot operated on is near the edge of a plate, extrusion will be more apparent. To say that there is no extrusion whatever is not borne out by the facts. This is actually illustrated in this case in plaintiff's Exhibit 2 to interrogatories, showing an alleged infringing product. In that the second weld from the top shows plainly slight extrusion, and at the bottom weld the escape of some metal under the pressure is still more apparent.

Particular 5 is not exclusively an advantageous incident of the process in question. Parts are united in situ, and while stationary in the process described in the patents considered above. Any movement they make is that preliminary to the welding, to arrive at the welding place, and not in the immediate process. In these disclosures, as in Harmatta's process, the plates to be united are not brought together for the purpose of thus conducting the current as they contact, but are fed together to the electrodes which carry the current to them as they are in contact.

We are of the opinion, therefore, that this invention is anticipated in all senses and particulars in the prior art, a consideration of which art also suggests that there is no room to claim here for a new process, which is worked out through a novel aggregation of old ideas not hitherto found in combination. None of these advantages seem to us to be new, nor is their association novel. We are pleased to note that Harmatta's attorneys (when there was a real contest on the merits in the interference; that is, before the Thomson Company took both sides of that controversy) held to a view which, if good, supports our conclusions respecting the illumination of the prior art. Defending against the insistence of Rietzel's attorneys that silence in the specification as to spot welding from the amendment of 1904 to that of 1910 amounted to an abandonment or disclaimer, Messrs. Duffy & Sons (brief) argued to the Patent Office that spot welding was saved on the ground of mechanical equivalency, citing Hunt Bros. Fruit Packing Co. v. Cassidy, 62 O. G. 1965, 53 Fed. 257, 3 C. C. A. 525. On this theory there is little question that the prior art has occupied the field, except the possibility suggested by Judge Dodge (Thomson Electric Welding Co. v. Barney & Berry, 227 Fed. 431, 142 C. C. A. 124), which he concluded was noninvention, that Harmatta cannot be credited with any new idea—

"beyond that of making his electric welds small in area, rather than large, in comparison with the areas of the opposed surfaces to be joined, and isolating them so as to leave each surrounded by a comparatively large area of unwelded surface."

But if the exact idea is not found in the prior art—if the idea was new in 1903—was it so significant a variation as to call upon inventive ability to develop it? We are fully aware of the danger in retrospective analysis, and we appreciate the demand that mere narrowness of departure from previous disclosures must not be allowed to defeat a meritorious invention. We likewise understand that the personal equation on the bench embarrasses a just application of the principle that that is invention which may be seen to be something more than

that fair deduction from prior art or usages which should readily occur to one reasonably skilled in the art and reasonably intent on its application. In the judgment of this court, more mistakes, pro and con, are perpetrated by the bench in the application of this principle than any single other. So much depends upon the vision or imagination of the individual who sits in judgment.

But, after all, what does this record plainly show? First, that suggestions of more or less potency did abide in the prior art. Second, that it required a hint from an examiner, after the applicant had suffered years of reverses, to advise the latter that he may have stumbled on a patentable idea. He suffered final judgment against himself in Canada upon a duplicate of his American application before he awoke, and, what is the plain inference from his preliminary statement in the interference case, rejections in several other countries where it is the practice to carefully examine the prior art before allowance. Third, it is in evidence here that the prior art so far advised others that they, before Harmatta's filing date, readily modified existing apparatus to do, with success, precisely what we have before us in the Harmatta patent.

We are not confined to reasoning merely that the idea in question was one which one reasonably skilled in the art and intent on its application should entertain without inventive effort. We find two instances, at least, where, when the demand came for the practice, the idea came also. This does not happen to be an instance where the art was broadened ever so lightly by one mind to meet a great demand of progress, with no contemporaneous effort meeting the situation as adequately. Nor is it a case where the substance of the invention was not followed until the method of the alleged inventor in question became well known, to the effect that such a circumstance, itself, would be "pregnant evidence of its novelty, value and usefulness." Magowan v. New York Belting & Packing Co., 141 U. S. 332, 12 Sup. Ct. 71, 35 L. Ed. 781. The infringing machines have a genealogy even anteceding Harmatta's in this country, and they were earlier on the general market than their rivals. So we sympathize with the reluctance of Examiner Rich in passing the application for allowance, for we do not consider that Harmatta was an inventor entitled to a patent in the instance before us. It appears to us that, considering the prior art:

"The improvement described in the patent was within the mental reach of any one skilled in the art to which the patent relates, and did not require invention to devise it, but only the use of ordinary judgment and mechanical skill." Phillips v. Detroit, 111 U. S. 604, 607, 4 Sup. Ct. 580, 28 L. Ed. 532.

Respecting the application of the principle in question, we think the case on the facts is in the same general category and controlled by the fact conclusions of such cases as Atlantic Works v. Brady, 107 U. S. 192, 2 Sup. Ct. 225, 27 L. Ed. 438; Morris v. McMillin, 112 U. S. 244, 5 Sup. Ct. 218, 28 L. Ed. 702; Hollister v. Benedict & Burnham Mfg. Co., 113 U. S. 59, 5 Sup. Ct. 717, 28 L. Ed. 901; Hendy v. Miners' Iron Works, 127 U. S. 370, 8 Sup. Ct. 1275, 32 L. Ed. 207. If, for instance, Brady did not invent anything patentable (Atlantic Works v. Brady, supra), by projecting from the stem of a dredge, ex-

tending a substantial distance below the bottom of the boat, a so-called mud fan, being a set of revolving blades somewhat similar in shape to those of a propeller, but sharper, on their fronts and less inclined on their faces, which, propelled by an extra engine in the bow, were to stir up a river bottom by their rapid revolutions, that the sand and mud might be carried off in a current of muddy water, because it was not an uncommon practice theretofore to disturb the bottom of a channel to be dredged through the action of vessels' propellers, whether the dredge proceeded backwards or forwards, it is difficult to see where any more dignity should be accorded to Harmatta's spot-welding idea, which involved and did nothing more than apply electric current and pressure to superposed metal plates to the same effect, substantially, as if the roller electrodes of the prior art were employed for pressure and current, but not revolved.

We have alluded above to the McBerty alleged anticipatory use. The evidence in this case is clear that from an experience McBerty once had with a butt welder was evolved the infringing machines, producing a large business which is imperiled by this litigation. There is no fair opportunity in the record to even suggest that this evolution was initiated or assisted by any knowledge of what Harmatta was doing. We are compelled to find that this was wholly an independent matter.

, To make the defense of prior use, the defendant has the burden to prove, beyond a reasonable doubt, that at a date prior to December 3, 1903, the Harmatta idea was reduced to successful practice in one or more of the instances pleaded. We think the defense is made in the proof of McBerty's experience in 1901. McBerty's credibility is savagely and most skillfully attacked, but, in our judgment, not always fairly. Several instances are noted where the record is somewhat violated to make a point against his veracity. For instance, plaintiff says in its brief that the Warren catalogue of 1901, offered in evidence, is inconsistent with McBerty's claim that steel centers were used at that time; but the quotation from the catalogue used to make the point applies only to the high-class machines described as A-fans, whereas McBerty is speaking of the cheaper fans known as G–2, which, according to other witnesses than McBerty, had pressed steel centers in 1901. There is no representation in the catalogue that the G–2 fans had brass centers. It attempting to describe the much-discussed Exhibit M and its relation to Exhibit P, counsel insist in the brief that—

"McBerty admits that Exhibit P was not made at the same time as Exhibit M, and not until long after, because he says that the piece which has been cut from the fan of Exhibit M, and which he says *appears in Exhibit P*, was not cut off from Exhibit M until 'quite a long while' after the fan blade of Exhibit M was welded to the spider."

But it is very plain in the record that McBerty is not talking about Exhibit P as cut from Exhibit M a long time after, but he is speaking about another piece cut from the extremity of the blade, the balance of which remains as Exhibit M.

There is, however, so much plain room for debate whether we

should receive Exhibit M and the cut of a G-2 fan in the Warren 1901 catalogue for everything that McBerty claims for them, that if McBerty were not strongly corroborated in the indispensable details of his story, we could not say that reasonable doubt whether the alleged prior use was had is eliminated from the proof. In saying this we do not mean to say that he is to be regarded as an altogether unreliable witness, or that we do not believe the essentials of his story; but even taking him as counsel for complainant picture him—go as far as they do in discrediting him as offering to suppress evidence by sale to the Thomson Company; assume with them that Exhibit M is a recent product, bearing a false date; reject as wholly fabricated his story that the cut of G-2 fan in the 1901 catalogue was made from a photograph of one with spot-welded blades; quote to the limit his concessions of conduct in 1913 which was devoid of frankness to Howe and others; judge his value as a witness in the light of his very great interest in the outcome of this case—still we find convincing testimony from others which not only makes evidence directly, but effects complete corroboration of the essential features of McBerty's claim. It is not indispensable to the defense of prior use in the Warren factory that we should be convinced either that Exhibit M is just what McBerty says it is, or that the illustration of the G-2 fan in the 1901 catalogue is from a photograph of a spot-welded fan. If true, these circumstances afford strong proof; if false, the defense is affected only through the discrediting of one witness.

We think it is proven here beyond a reasonable doubt that some time early in 1901, whether February or later is not material, a machine was operated in the Warren Specialty & Electric Company's plant at Warren, Ohio, adapted by McBerty from a butt welder, which successfully spot-welded a small quantity of fan blades, and that these, in assembled form, went into distribution in trade. No one is here to dispute by any direct testimony that Exhibit B (McBerty's alleged welder) did not do in 1901 in the Warren factory what the court saw it do in the progress of this hearing, and there are many unimpeachable witnesses who identify it and speak for it and as to what it did then. That what is successfully exploited then was the Harmatta process there is no room for question.

Of course, witness Lipps is weakened by his mistake as to the year he worked in Warren, and we must not overlook Capt. William E. Smith's relation to the case; but no other witness is subject to any reasonable discrediting suggestions. Maj. Crafts, Powers, Gilder, and McDonald are convincing witnesses; so are others to minor matters. This court believes them, and, believing them, we find some additional evidence in the McBerty and Lipps testimony, and very much in that given by Capt. Smith. Indeed, there is no good reason at all in discrediting the last as a witness in any degree, for his connection with this case is in no wise inconsistent with an entirely fair position as a witness, and he offers nothing that is not entirely credible. Five highly credible witnesses not only identified Exhibit B as the machine they saw in 1901, each of them having an individual and appealing reason for identification; but they fix the general date beyond question

268 F.—54

by reference to contemporaneous matters of both public and private interest. Some of them saw it successfully spot-weld, and all of them saw its product as worthy of and in the process of entrance into com-mercial channels.

To say that these witnesses are not telling the truth is to say sub-stantially that they are deliberately perjuring themselves, for their testimony is so individualistic that there is no fair chance to say that it is the product of a stimulated retrospective imagination induced by interest or friendship, or for some other reason not highly discredit-able. When McDonald, for instance, says that not only did he see McBerty weld a complete fan in 1901, but that he, in 1901, used a spot-welded fan as a test fan in the performance of his own duty as the final inspector of completed devices, and, with it as the criterion, tested and passed to the packers the product of that grade to go into the market, some of which had spot-welded blades, he is either reciting an important fact or is perpetrating a deliberate fabrication. We may make the same observation of the essentials of the testimony of Maj. Craft, Capt. Smith, Gilder, and Powers. Taylor's testimony also has some corroborative value because of his statement that in 1903, in the Peerless works, he saw Exhibit B, which he identifies, and used it to make spot welds.

In addition, the plaintiff itself introduced the affidavit of Frank G. Brown (deceased), given to Mr. Howe in 1913. Brown fixes the date of a Sunday visit to the Warren factory as prior to May 6, 1901, by reference to other transactions. There he saw Exhibit B and some spot-welded fan blades, but, there being no current on Sunday, he did not see a spot-welding operation. Subsequently, in the Peerless fac-tory, he saw the same machine in use for both butt and spot welding. The testimony of Ensor has some importance as corroboration. Of him, also, must it be said that he must have told the truth as to the essential feature of his testimony or he deliberately fabricated it. If he saw in 1910 or 1911 in the scrap room of the Peerless factory a completed fan having spot-welded blades, the fact is important. From what we are permitted to know in this record of the sleuthing activ-ities and disposition of the man Newton A. Smith, an agent of the plaintiff, who was present in the courtroom, but who did not deny the somewhat discreditable reflections upon him given by witnesses for the defense, little surprise is called for by the fact that subsequent to his visit to the Peerless factory this fan seen by Ensor could not be found.

[2] Some inconsistencies, discrepancies, and omissions do, in fact, appear in the affidavits Mr. Howe took in 1913 from some of the wit-nesses spoken of above; but such situations are usual and are the well-recognized weaknesses of affidavit testimony. It is usually not the composition and verbiage of the affiant, and it generally suffers in sub-stance because another mind intervenes, with interpreting and diluting effect, between the witness and the auditor of his testimony. Aside from this, plaintiff meets this evidence with testimony, largely nega-tive in character, which is, if disputatious at all, only inferentially and feebly so.

It cannot be said that the work at Warren was a mere experiment afterwards abandoned. The fact that witnesses speak of the incident as an experiment is not proof. Whether it was such is a mixed question of law and fact, to be determined from all the evidence, and not by the loose terminology of lay witnesses. The force of the testimony is that the trial was successful, and that its product got into commercial channels. Not only was there no abandonment, as that word is used in this connection, to be interpreted by the nature of the work as merely experimental, but a few years later Capt. Smith constructed a successful spot-welding machine for the Carnegie Company as a result of his knowledge of what Exhibit B would do, gained in 1901, and Taylor, aided by his knowledge of Exhibit B, designed for the Winfield Company a line of spot-welding machines which came into general use before the devices emanating from Harmatta were generally known in this country. The contest here is actually against alleged infringing processes performed on machines lineally descending from McBerty's apparatus of 1901.

[3] It is urged upon us by the plaintiff that the case on the facts and as to prior uses is within the authority of a number of decisions, the principal and most authoritative being the Corn Planter Patent, 23 Wall. 181, 23 L. Ed. 161, Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952, the Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154, and Deering v. Winona Harvester Works, 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153.

The question is one of the force of the evidence as affected by the quantum and character of the testimony and the possibility of coloration through lapse of time or interest, as well as the credibility of witnesses. The cases cited establish the salutary principle contended for by the plaintiff, but the question in each recurring case is whether its particular evidence meets the requirement. Compared with the character of the testimony in this case, the Goodyear Case, on the facts, loses any precedent value; there is a wide disparity in evidential force. The same may be said of the facts in the Deering-Harvester Case. There every one of the witnesses was under some sort of discredit; and the situation on the fact record is incomparable with what we have before us. Of the Supreme Court decisions (and we are discussing only them, because they control the lower courts relied upon by plaintiff), the facts in the Corn Planter Patent, 23 Wall. 181, 23 L. Ed. 161, and the Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154, most nearly approach, in character and force of the evidence derived from them, the record we have here; but neither of them present established facts of the cogency of those of the record before us.

In the Corn Planter Case the decision points out how the alleged prior uses in fact departed in substantial practices from the functions of the invention under attack. In the Barbed Wire Case the facts were under special and direct dispute, and there were elements of some improbability respecting the actual existence of a pertinent use. In the case of Warren Bros. v. City of Owosso, 166 Fed. 309, 92 C. C. A. 227, a decision by our own Circuit Court of Appeals and cited by plaintiff, the court not only found definite abandonment, but that the use it-

self, in its very essence, was experimental. We think these cases and the other cases cited are clearly distinguishable on the facts from the case at bar, respecting the force of proof of prior use.

The case of Lipps is a good example of the wisdom of the rule that proof should exclude reasonable doubt. There is nothing in the record to discredit him for integrity. He has no interest in the case. That he came on the stand and tried to be truthful there is no question, but he was mistaken respecting one very important identifying feature; hence, uncorroborated, he, like McBerty, lost much weight. But witnesses, in whose testimonies are weaknesses which disable them from substantially assisting a clear conclusion, when they are considered by themselves, or with other witnesses whose credibility is also weakened, may be so corroborated by the unembarrassed and impregnable testimony of others that, as to the indispensable details, they again may be heard with a large degree of favor. That is just what has happened here. If all of defendant's witnesses were open to the attacks which were more or less successful in the cases of Lipps and McBerty, the authorities just considered, and others from the lower courts argued to us, might be allowed to control our judgment respecting the conclusiveness of the proof.

But the situation is vastly different. On the controlling matter to which those two men speak—did McBerty, in 1901, on Exhibit B, successfully spot-weld, to their spiders, a quantity of fan blades, whether six or two dozen is immaterial, which fan blades were assembled to their motors, and the fans, so manufactured, placed in the completed stock of the Warren Company, to go into the market— there are five witnesses directly, and one or two more of indirect value, no one of whom is impeached, and they corroborate these weak witnesses. Lipps and McBerty, then, do in fact contribute very much that is credible to the court's information. This case, therefore, appears to us to fall within that category of cases represented by Supreme Court decisions, such as Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821, Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755, and Brush v. Condit, 132 U. S. 39, 10 Sup. Ct. 1, 33 L. Ed. 251, and to be a stronger case on the facts to carry the burden peculiar to a defense of this sort than even Coffin v. Ogden, supra.

If we did not have here Exhibit B so clearly identified, as well as the character of its early operation and product, there would be more force to the cases cited by the plaintiff. Exhibit B is a continuing concretion, a piece of evidence the existence of which does not depend, as in the alleged anticipating devices in the cases in question, upon oral testimony. It is to be noted how much more effective is Exhibit B in this case to support the defense than were the alleged Drawbaugh devices in the Telephone Cases, 126 U. S. 1, 566, 8 Sup. Ct. 778, 31 L. Ed. 863. Much of Exhibit B, just as it was in 1901, is before us, and its present reconstruction as it was then is well established by those, besides McBerty, who had every reason to know all its details as they were then. That it will successfully spot-weld was demonstrated. So Exhibit B appeals to us as established as a concrete, visible, contemporaneous, and most important matter of "proof which tells its

own story." The reason for the rule demanding conclusive proof of prior use is the ease with which such proof may be fabricated or colored, either corruptly or generally, through the effect of interest or friendship stimulating a memory to confuse fact with imagination.

We have seen the witnesses as they spoke on the stand. The naturalness of their stories suggest want of co-operation. They corroborate each other in the varying scopes of their experiences with Exhibit B. Their testimonies are to such important things that, if unreliable in substance, there is no escape but to assign willful perjury as the cause by a number of men whose credibility is not subject to attack from anything that appeared before us. The testimony of Smith, Crafts, Powers, Gilder, McDonald, Taylor, Ensor, and Brown (by affidavit) is all perjured—every one of these men, as well as Lipps and McBerty, is foresworn—if this allegation of prior use is substantially untrue. Perjury is unthinkable with such men as these men appear to be. Besides, their stories have in them no element of the unusual or unexpected. What they say McBerty did in 1901 is just what we can see one interested in the matter might readily do in due course of satisfying his interest. The incident was a logical step, plainly indicated in the condition of the prior art. Rietzel's experience is an independent parallel.

[4] The defense designated by (c) above, that the subject-matter of the grant was never entered under cover of the inventor's oath, is new to this case. If, however, the decision of the Barney & Berry Case, 227 Fed. 428, 142 C. C. A. 124, should be regarded as decisive, it would fail because it is based upon the theory that, while the case was pending in the Patent Office, there was a substantial departure from the original specification and claims, and the final grant was for something not in the case at all, as Harmatta's invention, until January 27, 1910. In the Barney & Berry Case, the ninth defense was that Harmatta's original application did not disclose the method of the final grant, and that while the application was pending it "was unlawfully broadened with intent to cover the successful method and article of the defendant and others." Although the Circuit Court of Appeals of the First Circuit said that this defense was specially urged to it, again, as to it, the decision is aggravatingly uncertain, and we are left to conjecture very largely to determine just what was the thought of the court respecting this matter, although the inference is impelling that judgment on this defense is against the defendant. If the court reaches that conclusion, however, on the basis of facts as it attempted to recite them, we are privileged to give the decision only perfunctory consideration. What is said about the matter is indefinitely confined to but a few lines, in which occurs this statement, to which we cannot agree:

"The patent was applied for on December 3, 1903, and was not issued until December 3, 1912; *but the claim for spot welding was always in the application.*"

As already indicated by us, we are unable to find any claim for spot welding, as such, before the amendment made in 1910, following

the hint of Examiner Shaw, given more than 11 months before. Certainly there is no direct claim for spot welding in the original application. Everything that even indefinitely touched upon it was taken therefrom in 1904, and was not put back for nearly 6 years. This condition of the record was the subject of elaborate argument by counsel for Rietzel in the interference proceedings between the Rietzel grant and the Harmatta application. In support of a motion to dissolve, upon the ground, for instance, among others, that Harmatta had no right to predicate the article claims in interference, because there was no supplemental oath attached to his amendment of 1910 to support them, counsel for Rietzel, in behalf of the Thomson Company, before the examiner, and before the Commisioner on appeal, produced arguments which seem to us to conclude the proposition in their favor. It is interesting to note that in the interference proceedings the question raised and so ably argued was not decided; the holding in each instance being that it was not to be heard on interference—that it was purely an ex parte matter.

While the defense is broadly stated in this case, it is, in argument, raised specially to the article claims, 16 to 21, inclusive, which were taken bodily from Rietzel and were never, prior to 1910, claims in any form in the Harmatta application. The question is not argued at all by counsel for plaintiff in this case. Whatever may be said respecting the abandonment or disclaimer of whatever disclosure there was in Harmatta's original application of spot welding, as very persuasively argued at one time in the proceedings by counsel for the Thomson Company, it is true that there was no hint of a demand for article claims until 1910. It seems to us inevitable that under the decision in Steward v. American Lava Co., 215 U. S. 161, 30 Sup. Ct. 46, 54 L. Ed. 139, affirming our own Circuit Court of Appeals, these claims (16 to 21) must fall, and that a decree in that respect, at least, should run against plaintiff. See, also, Yale Lock Co. v. Greenleaf, 117 U. S. 554, 559, 6 Sup. Ct. 846, 29 L. Ed. 952.

We prefer to discuss the alleged Rietzel prior use in connection with a defense which is peculiar here, which is, in our judgment, the most important, because it not only affects the interests of the parties immediate to this case, but it raises a question of great public concern, when we consider what the public relation to a patent grant is. While the defense is ostensibly but incidental estoppel, although as to an important matter, in effect it goes much farther because there is measurably involved in it the very integrity of the principle of patent monopoly. Judge Baker, in Railroad Supply Co. v. Hart Steel Co., 222 Fed. 261, 274, 138 C. C. A. 23, 36, explaining the reason why a presumption of validity of the grant should be indulged, and why priority of use must be established beyond a reasonable doubt, called attention to the fact that a patent is a "contract between the government on behalf of the people and the patentee," and that it is the fruit of an examination "on behalf of all the people" by public experts. Clearly the function of the Commissioner of Patents is to shield the public from the imposition of an unjustified monopoly. One is given a patent monopoly for 17 years as a premium for a real contribution to science

and useful arts. As Chief Justice Marshall said in Grant v. Raymond, 6 Pet. 242, 8 L. Ed. 376:

"It is the reward stipulated for the advantages derived by the public for the exertions of the individual, and is intended as a stimulus to those exertions."

No one is entitled to this reward, unless he produces some cogent proof that this contribution has first been made by him or in his behalf. His proof must be to those appointed to safeguard the public against an improvident grant. He is protected by a presumption of the validity of his grant, and he cannot be allowed to obstruct, directly or indirectly, that intelligent and full examination which only secures provident action by the public's representatives. The time within which he may enjoy the fruit of an invention by way of monopoly is strictly limited by the power of Congress. Defendant claims that the conduct of the Thomson Company in the obtaining of the patent to Rietzel, and also perpetrated in the Rietzel-Harmatta interference proceedings, estops it from asserting priority of Harmatta over Rietzel, and from questioning a prior use by Rietzel which would invalidate the grant sued on. If that contention is good, plaintiff's case must fail. What are the facts? February 25, 1905, Rietzel, then superintendent and general manager for the Thomson Company, applied for a patent assigning to his employer. The original specification stated that it was for—

"a method of forming an electric welding union between the plane surface of a piece of metal and another piece of metal and is especially useful in uniting two plates or sheets of metal at their plane surfaces."

One claim (No. 8) was broad enough to cover the alleged invention of Harmatta. In June, 1908, while the application was on an appeal to the Board of Examiners in Chief, from a rejection by the primary examiner, the latter found an anticipating reference in Harmatta's English patent, No. 22,981, of 1903, granted August 25, 1904, upon the filing of a complete specification July 25, 1904. Thereupon the case was remanded upon the insistence of the Thomson Company's counsel that they desired to be heard before the primary examiner upon the reference. An amendment was then filed in the form of a complete new specification, with an enlarged list of claims (23 in number), manifestly drawn to meet every conceivable phase of the Harmatta disclosure. In support of the amendment, Rietzel's affidavit of October 23, 1908, was filed to the effect that he successfully practiced the invention in the application as amended some time in June, 1904. His practice was described in detail. In December, 1908, his claims were rejected, particularly upon certain French patents to one Egel, who was Harmatta's assignee in France. These patents were published February 18, 1904. The Harmatta patents in England and France (one of those to Egel) made the same disclosures as Harmatta's original specification in this country. Thereupon, to meet the examiner's rejection, the Thomson Company filed Rietzel's affidavit of February 18, 1909, to the effect:

"That prior to the 18th day of February. 1904, he repeatedly successfully practiced the method of fastening two sheets of metal together face to face

by welding them at spots in their meeting surfaces by confining the heating electric current passed from one plate to the other in such spots and localizing the welding pressure at said spots, as claimed broadly in said application."

The affidavit further stated that he successfully worked at the plates at the factory of the Thomson Company, and in further detail described the character of the practice, relating it undoubtedly to the alleged Harmatta invention. Through the assistance of these affidavits, allowance of the application was obtained, and the patent issued July 20, 1909, under the No. 928,701, with 15 process claims and 5 article claims. The pending Harmatta application (filed December 3, 1903) was unnoticed.

We have already noted that the Harmatta application was enriched in 1910 by the adoption of a number of the claims from the Rietzel grant as the basis for interference proceedings. To succeed in this interference, it was necessary for Rietzel, who was the junior party, to file a preliminary statement to which his evidence should be addressed. This must claim a successful use antecedent to Harmatta's filing date, December 3, 1903. Therefore, June 14, 1910, Rietzel, produced by the Thomson Company, gave a verified preliminary statement to the effect that he conceived the invention set forth in the declaration of interference in 1897, and that, as nearly as he could fix the date, it was successfully reduced to practice in July, 1898, then being first explained and disclosed to others, and that the invention had been put to a very extensive use in the manufacture of metal work of various kinds. Thereafter the interference proceedings, declared April 26, 1910, progressed very slowly with several appeals prosecuted by the Thomson Company from the examiner to the Commissioner upon a variety of questions raised in the interest of the Rietzel patent. Numerous stipulations for extensions of time to introduce testimony, often at the manifest application of counsel for the Thomson Company, assisted to prolong the controversy. February 9, 1912, it was shown that Rietzel was in Europe, whereupon a further extension of time was obtained, so that Rietzel's testimony in chief was not to close until March 11, 1912. By this time the patience of the examiner of interferences was becoming somewhat weakened, wherefore an order was entered:

"That no further extension of Rietzel's time to take testimony in chief will be granted without a verified showing of reasons why the testimony was not taken within the time hereinabove allowed."

A month later (March 9, 1912), after the entry of this order, and only 2 days before Rietzel's time was to expire, a stipulation was filed extending the time for taking the testimony for 60 days, supported by the affidavit of Charles F. Tischner, a member of the firm of counsel representing the Thomson Company, defending the Rietzel patent, to the effect that for more than 6 months negotiations had been pending for settlement of the interference between the parties, and that the affiant, who had had the case in his personal charge for nearly 3 months immediately prior to the date of the affidavit (March 9, 1912), had been traveling to and from Germany, where he was negotiating for the purchase of the Harmatta invention in behalf of the Thomson Com-

pany; that the papers transferring the Harmatta application to the Thomson Company had been executed and were in transit, to arrive in a short time. The affidavit further stated, in face of the admission that the owner of the Rietzel patent had practically acquired the Harmatta interest, that—

"it is desired to take testimony in the interference *on behalf of the party Rietzel;* that it is expected that such testimony can and will be taken and completed within the 60 days extension of time now requested, and that the request is made in good faith and not for the purpose of delay."

How can it be said that the statements just quoted from Tischner's affidavit are true, and the promise therein offered in good faith? Later we deal with the contract between the Silesia Company and the Welding (Thomson) Company. It is there shown that, at the very time Tischner made this affidavit, he himself had closed a negotiation which made the statements of the affidavit impossible. Nevertheless, it served as a pulmotor for the Rietzel grant for the time being, for it caused to be approved a stipulation further extending time (to May 11) to take testimony, and undoubtedly was efficacious to effect still another delay to July 12. Later we note how it saved time to begin another suit on the Rietzel patent. When July 12 arrived, Rietzel, of course, was in default. The attorneys for the Thomson Company, who had in charge the company's Harmatta interests, demanded a hearing on a motion for judgment by default on July 23. On July 24 the Thomson Company's Rietzel side of the simulated controversy was granted 2 weeks to show good and sufficient cause why default judgment should not be rendered. Not answering this notice, on August 7 priority of invention of the subject-matter in issue was awarded to Harmatta, the senior party, with a limitation of appeal to August 27. There being no appeal, the Harmatta patent issued in due course as of the date December 3, 1912. The record shows that nothing substantial, if anything, stayed the granting of the Harmatta application early in 1910, except the filing of Rietzel's statement, in the interference under date of June 14, that he had anticipated by successful use Harmatta's filing date by a period of 5½ years; the use being followed by a successful reduction to practice in many ways. The delay occasioned by this affidavit was extended well into 1912 by that of Tischner.

The evidence before us shows that Harmatta executed an assignment of his application to the Thomson Company in Berlin February 3, 1912, undoubtedly while Tischner was there. There is in evidence also a contract executed in Berlin between the Thomson Company and the Silesia Company, the then owner of the Harmatta application. The date (April 3, 1912) to this contract (we have only a copy) must be an error, probably for February 3, for we find Tischner, who signed it in Berlin for the Thomson Company, swearing, on March 9 and in Washington, that it already had been executed. Harmatta's assignment to the Thomson Company was actually recorded in the Patent Office April 5, 1912. In the contract the Silesia Company agrees, in consideration of $27,500 to deliver an assignment from Harmatta to the Thomson Company. Of the consideration, $7,500 were to be paid

upon the delivery of the assignment, and the balance according to paragraph 5 of the contract, which should be read wth paragraph 6:

"5. The Welding Company further agrees to pay to the Silesia Company a further sum of twenty thousand ($20,000) dollars immediately upon the issue of a United States patent to the Welding Company for the said invention and application for patent of said Johann Harmatta, provided said patent is granted with the present claim 1 of the Harmatta application or a claim of equal scope therewith. For identification said claim is as follows: 'The process of electrically welding thin metallic sheets, which consists in introducing the sheet metal parts to be welded between electrodes, pressing said electrodes firmly together and closing the circuit, whereby the specified small round, very sharply defined place of welding which answers the purpose of a rivet is obtained, substantially as set forth.'

"6. The Welding Company covenants and agrees to vigorously prosecute said application for patent at its own cost and expense, and to use its utmost endeavours and those of its legal advisors and attorneys to secure the grant of said patent with a claim of the scope defined in the fifth clause hereof."

This claim 1 was originally claim 2 of the application as amended January 27, 1910. A further amendment was made when the Rietzel claims were taken over for interference purposes, and it became claim 1, followed by the claims taken from the Rietzel patent. After the interference was "won" for the Harmatta application, further amendment dropped this claim. Evidently the expansion, by this last amendment, of the claims from 15, which was the number existing when the interference was ended, to 21, as allowed, was considered to occupy the ground covered by this claim 1. Under the contract the Silesia Company retained certain rights of importation, which made it necessary to it to have the patent include the scope of the required claim.

Although the Thomson Company was already under this solemn contractual obligation to discard the Rietzel patent and allow the Harmatta patent to issue, for the latter displaces the Rietzel patent to the extent that they conflict, we find it suing the United States Metal Products Company in the United States District Court for the Eastern District of New York on a bill of complaint filed March 28, 1912, setting up the Rietzel patent and asserting, over the oath of its secretary, that Rietzel, prior to February 24, 1905, was the inventor of useful improvements in welding "since commonly known in the art as electric spot or point welding"; that is, asserting for the Rietzel patent precisely the force which the Thomson Company had solemnly agreed to allow to Harmatta's claim. Also, November 17, 1910, while the interference proceedings were continuing, and nearly 5 months after the Thomson Company had filed Rietzel's affidavit to anticipate Harmatta, this company, as Rietzel's assignee, began an action in the Circuit Court of the United States for the Southern District of New York against the National Enameling & Stamping Company for infringement of the Rietzel patent, alleging Rietzel to have been, prior to February 24, 1905, "the original and first inventor of certain new and useful improvements in uniting component parts of sheet metal structures, since commonly known in the art as electric spot or point welding." The evidence is also before the court that, during the extended period of the interference proceedings, and while the Rietzel patent had an apparent vitality afterwards denied it by concessions of the owner,

the Thomson Company asserted it in several instances to the extent of demanding and receiving profits upon it as a monopoly, although under contract to displace it.

Another curious circumstance, which is of some interest, at least, in this connection, appears in the record to this effect: Patent having issued to the Thomson Company, as the assignee of Harmatta, after this company, as the assignee of Rietzel, in the interest of the new patent, had abandoned all its solemn insistence of priority in Rietzel, and while the appeal in the Boston case was pending, a disclaimer was filed by that company of claims 1 to 6 and 16 to 20 of the Rietzel patent, being claims 1 to 6 and 17 to 21 of the Harmatta patent, and a further disclaimer of that part of the final specification of Rietzel which identified broadly the Rietzel invention with that of Harmatta. The necessity for the disclaimer was obvious under the circumstances, and we are not as much interested in the fact as in the reason which was given, as follows:

"That your petitioner has reason to believe that through inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the patentee, in said letters patent, has claimed more than that of which he was the original or first inventor or discoverer."

This is a remarkable statement, in view of the facts—that twice in the process of amending the specification the clause now disclaimed, which was the foundation for the disclaimed claims, was insisted upon; that even after allowance to Rietzel the specification and claims, including these disclaimed portions, were held up for the two successive revisions in the last of which was added one (No. 20) of the claims sought to be disclaimed; that as soon as Harmatta's work became known, through the English disclosure, Rietzel's counsel occupied the ground by amendment and by expanding the claims in number from 3 to 23, with a brief asserting very definitely that Harmatta was to be anticipated; that to support this occupation of the Harmatta territory Rietzel was made to affirm on oath his priority (affidavit of October 23, 1908); and that prior to the second of the amendments containing these now disclaimed matters, and for the evident purpose of definitely sustaining them as essential portions of his invention, Rietzel was caused to file another affidavit (that of February 18, 1909), in which he more specifically identified, as that which he had done to anticipate the disclosures of the Egel (Harmatta French) patent, the very things afterwards repudiated, as unintended. How this evident taking of Harmatta's ground could have been "through inadvertence, accident, or mistake" is, in view of these facts, beyond comprehension. The disclaimer is equivalent to saying that Rietzel's affidavits just referred to were fabrications, and willful ones, too, for they (especially so in the second) were too particular and pointed to allow it to be said of them that their statements were the result of "inadvertence."

In this same connection the mind reverts again to Thomson's affidavit, already referred to, of November 30, 1908, filed to support that amendment which was the first to contain this alleged inadvertent and accidental matter. In this affidavit Thomson says:

"That he is familiar with the process of electric welding set forth in the above-entitled application of A. F. Rietzel for uniting sheets of metal together *by what has been known as the 'spot-welding process,'* and which forms a practical substitute for the riveting of plates together or for other mechanical expedient for fastening them together face to face.

"That one of the methods of uniting pieces of metal together by riveting, and for which the aforesaid spot-welding process forms a valuable substitute was patented by him by United States letters patent dated January 8, 1889, patent No. 396,015."

These paragraphs precede the one already quoted, in which Thomson endeavors to contradict the import of the specification in his patent 396,015. Thomson, when he gave this affidavit, surely knew that Rietzel was being made to claim the things which were afterwards disclaimed. He was not only then and at all times an officer of the disclaimant, but its expert on these very matters.

The question of the candor and good faith of this disclaimer grows in seriousness when we recall that it was upon these identical features of the Rietzel patent that the Thomson Company brought the two suits above referred to and proceeded to issue many licenses, and further, when we note that Harmatta's allowance was stalled for more than two years by a further repetition of the "inadvertence, accident, or mistake" in the shape of Rietzel's affidavit of June 7, 1910, filed in the interference proceedings. The "invention set forth in the declaration of interference," which his assignee (the Thomson Company) had him then swear he conceived more than a dozen years before, was, as the counts in the declaration show, precisely that which the specification paragraph and the claims now attempted to be disclaimed were in the application to cover. It was to maintain them that the affidavit was filed. The statement in the disclaimer, explaining why Rietzel took Harmatta's ground, is plainly untrue; it is difficult to resist an impulse to say that it is deliberately untrue. The Thomson Company made a record which very plainly belies its assertions. The incident is more illustrative than directly applicable to the special defense in question, but its illuminative powers are very important.

The Thomson Company will have made this "inadvertence, accident, or mistake" extremely profitable, if plaintiff is allowed to maintain its Harmatta patent, for then it will follow that it has obtained protection of its monopoly of this invention from July 20, 1909, to December 2, 1929. It is clear to this court that such a result, upon this record, should not be allowed to follow through the favorable adjudication of plaintiff's right to maintain action on the Harmatta grant. It seems to us clearly against public policy and subversive of equitable principles to give plaintiff a decree which, in sustaining this patent, will operate to give it a monopoly not sanctioned by law.

Pomeroy (Equitable Jurisprudence [3d Ed.] vol. 2, § 805), upon authority of many decisions, sums up the conditions which must be met that equitable estoppel may exist as follows:

"(1) There must be conduct—acts, language, or silence—amounting to a representation * * * of material facts. (2) These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. (3) The truth concerning these facts must be unknown to the other party

claiming the benefit of the estoppel, at the time when such conduct was done, and at the time when it was acted upon by him. (4) The conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. * * * (5) The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. (6) He must in fact act upon it in such a manner as to change his position for the worse."

Each of these six conditions are present in this record, when we consider that a patent grant is adverse to the public, which is a party to the allowance through representation. The disclaimer which we have just been considering is to be regarded in connection with Pomeroy's fourth requisite, that "the conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party," etc. Of course, when the Thomson Company caused the Rietzel application to be amended to cover the Harmatta territory, and obtained from him the two affidavits under consideration, and from its welding expert, Thomson, another, the purpose was to affect the judgment, in these precise matters, of the public's representatives in the patent office. So, also, that was the object of Rietzel's affidavit in the interference, as well as that of Tischner, asserting that it was proposed, in good faith, to show, if the time for taking testimony were further extended, that Rietzel had priority over Harmatta—an affidavit made immediately following affiant's return from Europe, where, for his principal, he had entered into a contract to perform which made it impossible to meet the terms of the promise in his affidavit. The purpose of these affidavits was to vitalize, against opposition, the Rietzel claim of monopoly to precisely the features of invention which were afterwards attempted to be disclaimed. They effected their obvious purpose, to the great advantage of the Thomson Company, which the latter pugnaciously held until, obtaining the Harmatta interests, it no longer needed the protection of the Rietzel grant.

To allow the affidavits to be repudiated now is to allow plaintiff to take advantage, to the disadvantage of the public, of what it now would admit was its own wrong against the public. The case before us is in principle covered by Union Manufacturing Co. v. Lownsbury, Fed. Cas. No. 14,368. Either the Rietzel affidavits state the truth, or they were deceptive—intentionally so, or most recklessly devised and employed. If they state the facts, we have in the circumstances a prior use displacing Harmatta as an inventor. If they are subject to criticism as untrue, the plaintiff, who is intelligently responsible for them, is in this court with unclean hands. It cannot be heard to plead a culpability from which it so greatly profited. It is fair to Rietzel to say that he had no part in the disclaimer. He was not aware that even Harmatta had prevailed over him in the interference until so advised by this suit. We must hold that plaintiff has estopped itself to deny priority in Rietzel which it so frequently and pertinaciously asserted against the public for years, and that the estoppel is available to defendant here. This alone defeats plaintiff's demand for a decree.

It is difficult to understand how the Patent Office should have allowed itself, without investigating the truth of Rietzel's claim of prior

use, to allow by default to Harmatta the invention, after it was apprised that both sides were occupied by precisely the same interest, and that to the Thomson Company there was a very great advantage that the office should quietly act as it did. No matter what the Office practice was, here it operated to give Harmatta's assignee an undue advantage over the public.

A decree may enter, finding the patent invalid, and dismissing the bill.