**ELYRIA IRON & STEEL CO. v. AMERICAN WELDING & MFG. CO.**

(Circuit Court of Appeals, Sixth Circuit. October 16, 1926.)

No. 4212.

1. **Patents** ☞328.

Lloyd patent, 1,128,039, May 28, 1912, claims 4, 5, and 8, for process for manufacturing metal tubes, *held* invalid.

2. **Patents** ☞328.

Lloyd, No. 1,124,760, January 12, 1915, claims 7 and 12, for continuous welding mechanism, *held* invalid.

Denison, Circuit Judge, dissenting.

Appeal from the District Court of the United States, for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Patent infringement suit by the Elyria Iron & Steel Company against the American Welding & Manufacturing Company. From a decree dismissing the bill (15 F.[2d] 106), plaintiff appeals. Affirmed.

Chas. Neave, of New York City (Wm. G. McKnight, of New York City, and Bert M. Kent, of Cleveland, Ohio, on the brief), for appellant.

Dean S. Edmonds, of New York City (J. F. Brandenburg and Leslie B. Young, both of New York City, on the brief), for appellee.

Before DENISON, DONAHUE and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. [1, 2] This suit is for infringement of claims 4, 5, and 8 of the process patent to Lloyd, No. 1,028,039, and of claims 7 and 12 of the machine patent (No. 1,124,760) to the same inventor. The complete process provided for is one of continuous tube welding, whereby a flat strip of thin metal, fed to the machine at one end thereof, is forced in tubular shape by progressively passing between so-called forcing dies, which make the strip semicircular in cross-section, then through an annular die which causes the edges of the stock to close tightly together, in connection with which operation the tube is subjected to the action of a positioning tool, which corrects the tendency of the tube strip to twist or creep circumferentially, then between horizontally disposed rollers adjusted as to pressure upon each other, which hold the tube against lateral movement, the rolls being so formed that the exposed edges of the closed seam are subjected to an oxyacetylene flame, which fuses both edges of the seam; the latter being meanwhile, by the formation of the surface of the rolls, pressed and held tightly together, the tube walls, other than the exposed seam edges being at the same time kept chilled by the application of water flowing through channels in the roll structure. The welded tube then passes under a tool which cuts or scrapes off the burr caused by the welding of the seam edges, then being subjected to a tool which slightly reduces the

circumference of the tube. It then encounters a tool which cuts off the tube at the desired length; the movement of the strip and tube (when formed) being throughout longitudinally forward and at a constant speed. The elements of formation of the tube from the strip, the removal of the burr after welding, and the circumference reducing and cutting off features are not in the claims in suit.

Judge Westenhaver, in a considered opinion, reached the conclusion that, in view of the prior art, the claims in suit are limited to the welding process; that whether or not Lloyd's complete process, hereinbefore stated, showed invention, the welding process disclosed did not; that that process was merely the well-known butt welding; that Lloyd was not the pioneer in either that art generally or in the seam welding art; that his process is simply an application of heat—sufficient to fuse to the melting point—to the seam edges of the tube, and the application of sufficient pressure to weld them; that there is no patentable distinction between Lloyd's "melt" weld and the "electric" weld and "blacksmith" weld of the prior art; and, specifically, that there was no invention in substituting a gas torch for the previously known electric conducting rolls; and that this case falls within the decision in the so-called "Spot Welder Case" Thomson Co. v. Ford Motor Co. (D. C.) 268 Fed. 836; same case, 281 F. 680 (C. C. A. 6); same case, 265 U. S. 445, 44 S. Ct. 533, 68 L. Ed. 1098). The bill was accordingly dismissed. While the judge was of opinion that both patents in suit are anticipated by the French patent to Altman, No. 363,962, with addition No. 13,595, by the French patent to Maugin, No. 395,292, and the French patent to Harmatta, No. 410,597, the conclusion of invalidity was not made to rest upon that consideration.

Without reference to the question of technical anticipation a majority of this court agrees with the conclusion of the District Court and the reasoning on which it is based, and is content thereon to affirm the decree below.

DENISON, Circuit Judge. I find myself unable to concur in the conclusions of the court. A reference to the opinion of the court below will sufficiently explain the applicability of this summary statement of my reasons.

In a commercial sense, and as applied to a distinct although specific field, Lloyd was not only a pioneer but he created an industry.

No one before ever used a machine for automatic torch continuous welding of tubes of a considerable length; and of the very small sizes of tubes of which, since this invention, there has come to be an enormous use, none had ever been made commercially by any welding process. Such paper approaches as were made to Lloyd's machine and process seem rather, by their oblivion and his success, to emphasize that the differences were probably more important than they might now seem.

I see no sufficient reason for saying that the claims in suit should not have a due share of the credit for Lloyd's commercial success. True, they were exploited in connection with his other patents and other claims of the patents in suit; but, after all, the continuous automatic torch welding covered by these claims was the heart of the process and of the machine; the other patents only furnished the body in which the work was carried on; and so, I think, whatever novelty there was in this heart-operation should have the full benefit of any presumption to be drawn from the great adoption of the Lloyd machine.

Of course, all varieties of welding are, in a broad sense, part of the same art; I suppose it should even be said, since the Supreme Court decision, that spot welding is butt welding, and butt welding is spot welding; nevertheless, there are differences, and it seems to me substantial ones, between the electric resistance butt welding of seam edges and Lloyd's melt welding of such edges. In all butt welding the surface scale, which otherwise prevents union, must be broken down by hammering or other form of high pressure, or else we would get nothing but a "stick"; in the actual melting and fusing together of the two edges there is a distinctly different physical action. Whether it is unpatentable to substitute one for the other, because they might be thought to be well-known equivalents for each other, would have been initially debatable; but, under the circumstances of this case, where, if we should say there is no substantial difference we deny the history of the art and reverse the judgment of practical men, we would take a responsibility which I think is too heavy for a court to carry. This might be illustrated by the action of the Standard Parts Company. It owned the machines and the patents for making these tubes by the best methods and devices in existence, using the electrical resistance process; and yet it paid $300,000 for what Lloyd could give to it. It seems improbable that it would have paid

this sum for the various details of the Lloyd machines unless it had believed that they rested upon a process substantially different from the one it already had.

In deciding whether there was invention in substituting a melt weld for the resistance weld, it may properly be noted, not only that it had never been done commercially, but that the expert engineer for the Standard Parts Company, looking for the best, rejected the Lloyd idea when first offered to him, because of his confidence that the Lloyd process was scure to make a "rotten" weld. This was the current expert judgment.

It is true that the claims do not, in express words, call for the low pressure melt weld as distinguished from the high pressure electric resistance weld; but the specification points out this distinction; and I think the claims should be thus limited, and that this limitation can rightly be imposed, under the familiar rule of construing by reference to the specification any uncertainty disclosed by the claims.

The closest patents in the earlier art are those of Altman and of Budd. Altman's earlier patents clearly do not anticipate, because of numerous differences. One familiar with the Lloyd patent and later developments might readjust and rearrange the parts of Altman so that he would anticipate Lloyd or approach very closely; but this is not permissible. Altman's reissued United States patent is closer, but in this closer particular the reissue is a departure from the original and the reissue filing date is too late. Altman's third French addition is also more pertinent, but it is shown by evidence, not disputed, that Lloyd was ahead of the effective date of this third addition.

Budd clearly does not anticipate, because, if for no other reason, his tube does not travel; but it is said that merely a reversal of parts to transform Budd into Lloyd involves no invention. It needed more than that. Budd had his open seam tube clamped firmly and permanently in position while the flame traveled. The moment we begin to move the tube past a stationary flame, we meet difficulties. There must be a seam guide and additional holding means, neither of which did Budd have. Further, Budd so manipulated his torch, by constant, reciprocating lateral swing, that it is difficult to see how he could possibly make a good weld. It was inevitable that his weld should be composed of relatively good and relatively bad sections or spots. If he put these close enough together it might do for some purposes. The only things ever made on his machine were foot

15 F.(2d)—8

rails, where it was of no importance whether there was a good weld so long as the edges did not come apart. The use of the machine was abandoned. Many samples were produced of welds specially made for the trial by many older devices; · none were produced made according to the Budd patent; it is inferable that such products would not have been creditable.

I also think there is infringement. The contrary conclusion implies that the phrase "at the point" in the claims means that the exact point may not be varied by the fraction of an inch. If there is any real invention in the patent, nothing in the art requires any such close limitation.